I was asking one of my fellow attorneys if he'd walk me up rubbing my shoulder as well. Okay. I think we're now readjusted. So, Mr. Klein. Thank you very much. Good morning. My name is David Klein, and I represent Mr. Brooks in this matter. And if I may, before I forget, try to reserve five minutes, Your Honor, for rebuttal, if that would be okay. I was in Mr. Brooks' trial counsel, and I raise that not because, just because when you're looking at it over at this point, as appellate counsel at this time, and I'm looking over the record, there are certain things that happen at the trial that strike one as unusual. And, well, not only unusual, but erroneous. Mr. Brooks, as the Court is well aware, I mean, was facing a two-count indictment. His defense basically was on one count that people were lying, and the second count was an entrapment defense. The first error that I'd like to bring to the Court's attention is the issue of whether or not Mr. Brooks' wife could testify about a threat that was made towards her and the family. The proffered evidence, Your Honor, in justices was that Ms. Sylva Brooks were to testify that government's agent, this Mr. Wong, had called her and had said to her, you know, if Steve doesn't pay the money, you know, we're going to hurt everyone. You know, we're going to hurt you, we're going to hurt the family, we're going to hurt that. Government objects to that, right? It's not relevant to any of that. To say that's not relevant, I mean, you know, and now they're arguing, and it was argued at trial. Well, I don't need to spell out the relevance in length. Sure, a threat to Brooks is relevant. And there was plenty of evidence of that, which raises an issue of harmlessness. But just the chain of relevance of her state of mind, or was it offered for her state of mind? Was it offered for Brooks' or was it offered for Wong's? Well, it was offered for, as far as I'm concerned, it goes to Mr. Brooks' state of mind. Well, then she can't, if it goes to Brooks' state of mind, then isn't it clear that she cannot testify to why? She could testify that Brooks was acting strange, was acting scared, was acting nervous, was acting apprehensive, was acting uncharacteristically, all of those things, which is his state of mind, but the rule precludes her from saying why. Well, I don't agree with that. Okay, why not? And the reason I don't agree with that is because I'm married, okay? Many of us are married here, and we have a very close relationship with our spouses, some of us closer than others, perhaps. But if my wife were to tell me, okay, hey, I just got this phone call from your friend, Wong. Wong told me that if you don't come up with that money, he's going to hurt me, he's going to hurt you, he's going to hurt our children. That's not going to have an impact on me? That's not going to have an effect on me as far as whether or not I should do a transaction with Mr. Wong? I mean, that's what it is. If that threat had never been passed to Mr. Brooks, there'd be no issue here. I mean, if she weren't going to say, and I received this call and I tell Mr. Brooks that, right, then what's the issue? I mean, there's no issue because he wouldn't have known about it, right? And that's what derivative, perhaps that's what everyone's thinking about in the derivative entrapment sort of thing. But before we get to the derivative entrapment, when we're dealing with hearsay, so to speak, right, and we're dealing with issues of the hearsay, the first question is, is it hearsay? I mean, the mere threat, right? And it's not. I mean, whether or not Wong- Well, it's arguably the basis for action, which Clare Brooks could have testified. I mean, I know he can testify, you know, somebody threatened me, and that's how come I acted this way. There's no question. That is not- That would not be hearsay. Right. There's no question about that. But it's also not hearsay because, you know, the general rule is hearsay is, you know, an out-of-state, you know, statement offered to prove the truth of the matter being asserted. So the fact that I'm going to tell someone, you know, if you don't pay me the money, I'm going to kill you, that's not- It's the mere statement itself that is being made that is the issue. It's like a contract or in that level on a hearsay sort of thing. But it's not hearsay. Perhaps it's not relevant. I mean, you know, that may be a different level to look at it is perhaps because it was passed on to Silva Brooks. It's not relevant. But I just don't see how that could not be relevant to Mr. Brooks' state of mind. The question perhaps, you know, and they do talk about and the government has talked about in their- in their answering brief and this concept of derivative entrapment. And as I indicated and what I've read about derivative entrapment, they always talk about where it's an individual who's a principal wrongdoer. If I go ahead and I entrap, you know, I'm this- and I go to Joe Smith and I get Joe Smith to do something, Frank Smith can't come in all of a sudden and say because of my conduct to Joe, he's been entrapped. Okay? Now, you may say, well, there's this fine line. I mean, isn't that what you're doing here? But that's not what we're doing. First of all, Silva Brooks is no principal wrongdoer here. She's just this innocent party. And I don't think that derivative entrapment is really this- I mean, let's take the other side of it. Let's take the other side. Let's say it's okay. Let's say it's okay for this evidence not to come in. Are we going to okay that sort of conduct? Are we going to say it's okay to exclude when a person is facing a trial for- he may go to jail for virtually the rest of his life, the fact that his wife is going to testify about a threat that was made by an agent of the government? I mean, we have juries for this reason. We have juries. You know, they could either believe that. They could either believe Silva Brooks when she testified whether that threat was made. They could have also decided whether or not they were going to give it any weight to Mr. Brooks. I mean, that's what it's about. It's about them deciding it, having it in front of the jury to decide it. Now, this was just a case in which Mr. Brooks had- all this, perhaps you would even say this could be considered harmless error. But when we're looking at the record on all this, this whole thing happened over months of time. I mean, the government would say, well, Mr. Brooks didn't want to do any transactions because he was being a little bit careful about what he was doing. We would say that he didn't want to do the transactions until the government entrapped him into it. The fact is that it happened over months of period of time. This individual, Randy Wong, who they had basically released from detention, called Mr. Brooks. The record is clear. He's called him a lot during this period of time trying to get him to a transaction. And it's not until after this threat is made to his wife, or his wife is going to testify about this threat, that the transaction actually occurs. That's Mr. Brooks' defense. And when we look at it compared to other rulings that the trial court made in this case, and what I'm talking about the other rulings is, for example, obviously the credibility of Mr. Wong was crucial in this case. The credibility of the agent, Lawson, was crucial in this case. That was the whole case. And Mr. Brooks attempted to discredit the credibility of Mr. Wong. Well, Wong wasn't quite the entire case. Well, no, he wasn't quite the entire case. I'm not disagreeing with that, Your Honor. I mean, obviously there was more than just that. There was Agent Lawson as well. There was money found in a hotel room. There was financial records as well. Mr. Brooks? And there's lots of evidence that Wong had, you know, about Wong's conduct with Brooks. Well, there was evidence. Being upset about the debt. Other evidence of threats. I'm sorry? Other evidence of threats. Yeah. Well, there's evidence that they had a relationship over a period of time, right, that Mr. Wong had supposedly invested money into a business with Mr. Brooks, that Mr. Wong wanted this couple hundred thousand dollars back from Mr. Brooks, that Mr. Brooks had a paid telephone business that we would say possibly could explain some of the cash that he had laying around. There are other factors that were involved in this case, clearly, Your Honor. But when we're looking at it, I mean, look, we are dealing with it, I think, in some level on a harmless error sort of analysis. But when you're dealing as well with an individual where, you know, I can't think of anything more fundamental, you know, Your Honor, than this concept of a threat being made to one's spouse. And to say that that can't come in, whether or not that's a reversible, you know, whether or not that causes the whole case to be reversed is perhaps a different issue. But to say that that can't come in, Your Honor, I don't think the rules of evidence indicate that. And even U.S. v. Emmert, that the government cited it. What rule would you be working toward? I think Judge Reimer asked you earlier, what's the tie between the threat to the wife and the conduct or the impact on the defendant? And there doesn't seem to be anything in the record that shows a tie. And as far as we know, the defendant's a super macho guy. And in his mind, he'll break his head like a pimple if Wong so much as looks at him. So don't you have to have a tie between the threat and the defendant before it's a missile? No, I understand that. I mean, I realize what you're saying, that there would have to be some evidence that Mr. Brooks reacted in a certain way as a result of it, that he was very distraught about it and so forth and so on. And I wish that that was in the record, Your Honor. But what's not in the record and what wasn't given in front of the jury was the concept that even this threat was even made. Did it have an impact on Mr. Brooks? Well, we do know that he then went ahead and did this transaction. And what we would say is that- There was a lot of preliminary stuff to the transaction, which makes it a little tougher sell for you, in that he did an awful lot of initiating in this transaction. Well, I mean- He had done a lot of it before and a lot of the phone calls were his. Well, a lot of the phone calls were from- Mr. Wong also had called Mr. Brooks supposedly almost every day after he had been released. He was trying to get a hold of him. He was trying to talk to him. He was trying to do all that sort of thing. So I don't think it was- This went on for months. I mean, it wasn't- The first time they had a meeting, he had a meeting with Agent Lawson. This meeting wasn't recorded in this meeting in which supposedly Mr. Brooks had talked about how he started rolling drugs soon after he got out of prison and all that. And that's why Mr. Lawson's credibility was obviously very crucial in this whole matter as well. Because if the jury were to believe Mr. Lawson and Agent Lawson, then there's no question I think the jury would convict them on that- And that goes us into the Hentorn material. I mean, you know, the question of whether or not Mr. Brooks should have had the opportunity to examine Mr. Lawson about allegations that were made about Mr. Lawson during an investigation at the Drug Enforcement Agency. The fact that a fellow agent had accused Mr. Lawson of covering things up, of lying, so forth and so on, and the court ruled that that was inadmissible. When we're dealing with something as fundamental as the credibility, I mean, we all know that. Police officers testify. Agents testify. Juries believe them. I mean, people will say, well, that doesn't happen all the time. But for the most part, one of the things we do during the law year, Your Honor, is we talk about you're supposed to believe police officers no more than you believe anyone else out there. You understand that. And the reason we tell them that is I think the courts acknowledge it. We all acknowledge that. I mean, I raise my children. We all raise our children like that. You know, follow the police officer. You know, what the police says, he tells the truth. He's here to help you. He's there. So when you have juries sitting here and they're listening to these individuals tell these sort of things, and you have the agent testifying about this, defendants should be allowed to cross-examine them. They should be allowed to ask things that is hand-drawn material. Is that going to make the difference in the case? Well, it could. I mean, you know, the question of how they question later on Spencer in all this. And I see I'm getting close to my five minutes on rebuttal on all this. And if there are no questions at this time, maybe I could save the reserve for the remaining. Oh, surely. Thank you. All right. Ms. Sheehan. Thank you, Your Honor. Good morning, Your Honors. My name is May It Please the Court. My name is Loretta Sheehan, and I'm an assistant U.S. attorney here in Honolulu, Hawaii. I wanted to answer the Court's initial question, and that is with a citation to the record in the supplemental excerpts of record as to what the testimony of the wife was offered for. And in the record on page 1046, Mr. Grimes indicated that he wanted to bring out the threat to Sylva Brooks. Quote, It's offered to go to the state of mind of Randy Wong during these calls, end quote. So the position below taken by the defense was that it was offered specifically for the state of mind of Randy Wong, which is completely irrelevant. I agree with the Court that the thing that is relevant would have been relevant and was relevant in the case of Barr was the state of mind of the defendant. If I may back up for a second, the defense counsel suggests that some sort of fundamental right was violated by disallowing the wife to repeat the words spoken to her over the telephone. And there's a suggestion there that it is of a constitutional dimension. So to address that, my first argument is that, first of all, there was no improper limitation. I'm sorry. It seems like we're all – we all have the same cold, Your Honor. Yeah, it was affecting my hearing. Could you repeat just the last thing you said? Sure, I apologize. There was no – there's a suggestion that there's a constitutional dimension. So my first argument is that there simply was no improper limitation and there was no infringement of a constitutional right to cross-examine or to present your defense. The entire purpose of putting on the defendant's wife was, even though the proffer was that it was to explain Randy Wong's state of mind, which is irrelevant, the only possible relevance would be to explain her husband's state of mind in late August, just before he brought the drugs over, that he was scared and he was entrapped. Now, that would be relevant, the husband's state of mind, the defendant's state of mind. My point is, in terms of this constitutional argument, is that the jury got that. They got – they absolutely got that information. The defendant wanted to show that his wife had told him about a threat, an alleged threat made by Randy Wong through the wife. And the record's very clear that he got that. The wife testified that Randy Wong called her, that he was very angry, that he made her very upset. She actually did get out the threat, and the bell was rung, but the court pulled it back and instructed the jury to disregard that statement. She was quite anxious to get that out. She testified that she was scared. She was scared for her life. She was scared for the life of her children, and that she told her husband all about it. So that is essentially my first argument regarding the suggestion that there is a violation of constitutional dimension. But moreover, going back to the details of the record, we still argue that the judge was absolutely correct in not allowing Silverbrooks to repeat the words. As the court has pointed out, Randy Wong's words were – and I actually have to take issue with the court's suggestion that Randy Wong's words, the threat, would not be hearsay, because in this case the defense raised the possibility of outrageous government misconduct. And maybe Randy Wong was going to go over there and bust somebody's head up if he didn't get his drugs. And so I understand where the court's coming from, that maybe it's not really hearsay because it's not offered for the truth of the matter asserted. But this defendant was raising the issue of outrageous government misconduct, and Randy Wong was – I believe there was a question to Special Agent Lawson where Mr. Grimes said, do you ever hear of a loose cannon, Special Agent Lawson? I mean, that was their theory, was that Randy Wong would do anything, whether the government knew about it or not. So there is a very strong argument that this is hearsay, that they were trying to show that Randy Wong would do anything. So our argument is therefore that the judge was correct. It would be hearsay, what Randy Wong said to Sylva Brooks, for her to repeat to her husband. And our stronger argument, of course, is that this is completely irrelevant. Wong's state of mind is not relevant, and the wife's state of mind is not relevant. The – if I may – Emmert was discussed. And, I mean, I don't think – I don't see Emmert being distinguished on its face just simply because the Emmert case and the other cases that have to do with derivative entrapment dealt with a co-conspirator or someone who was a party to the actions. The argument is the same, regardless of who the conduit is, and that is that there is a clear rejection of the conduit theory. And you know why that is. I think the court's already pointed that out. It's the policy underlying it. If the defendant wants to say he was so scared he had to go sell drugs, the defendant has to get on the stand and say so. You don't get to sort of get it in through somebody else and sort of imply or hope that the jury infers, oh, this guy must have been scared to death. You have to get on the stand and expose yourself to cross-examination by the government. That's only fair. That's only right. And I think that's why 803.3, under the Federal Rules of Evidence, the exception to the hearsay rule that discusses state of mind, I mean, that's why the advisory notes say so. The advisory notes say you can get in state of mind, but we're not going to let you get in all that underlying stuff. We're not going to let you get in your statement of belief or reasons, your reasons behind it, because if you want to say so, you have to be subject to a cross-examination. If the court was somehow tempted to not adopt the government's argument and to take a second look at Emmerd and to take a backup position, you know, when I was reading the record again this past weekend, one thing that became very, very clear to me was something interesting. What happened in this case is that defense counsel asked Silverbrooks, here's Randy Wong, what did Randy Wong say to you? And that was properly excluded. If the court will notice, a careful reading of the record, what was never asked? What was never asked, and which I think the defense counsel would actually have an argument if it could get around the hearsay argument, is what was never asked in the record was, okay, what did you repeat to your husband? That actually was never asked in the record, and actually that's what is necessary to bring it full circle if you want to somehow say something about the defendant's state of mind. You start with Randy Wong. Randy Wong, what did you say to the wife? But then the question was never asked by defense counsel. Okay, what did you repeat to your husband? And that's the part, as the court has pointed out, that's the part that links it up, arguably, without subjecting the defendant to cross-examination, which I think would be unfair to the government. But that's the part that was simply never asked. And so that's actually a secondary, a backup position, if you will, by the government, is that even if this court was tempted to revisit Emmer and to tinker with the derivative entrapment theory or to somehow find that this would be relevant or that the jury would be entitled to infer what it wanted to without subjecting the defendant to cross-examination, it can't do it on this particular record. It can't do it on this record because, in this case, defense counsel simply never made all the necessary jumps, never made all the necessary links. So those are our essential arguments with regard to Sylva Brooks. Our argument is that there was no error, that the questions that were asked were not relevant, they didn't prove the defendant's state of mind, the full links were never made, and I think there was a very strong argument that it's hearsay. With regard to the Hempthorne argument that was made, I'll touch on that very lightly. The court clearly did not abuse its discretion in excluding the Hempthorne material. This was a disagreement between an employer and his supervisor about a stuffed bird being kicked around the office. It had nothing to do with the criminal investigation. It didn't happen during the time period of the investigation. It was irrelevant, petty politics, and the court clearly did not abuse its discretion in keeping that out. It was about a stuffed bird. With regard to Spencer Tracy, which was just touched upon, so I need to address it. My first point about the impeachment of Spencer Tracy. First of all, the defendant's brief is incorrect to the extent that the impeachment of Spencer Tracy, I always mix up his name, I'll call him Mr. Tracy because I'm so tempted to say Tracy Spencer. The impeachment of Mr. Tracy, it didn't come in as substantive evidence and that's a really important point. The court, thank goodness, did not allow the government to move in his statement, Exhibit 112, into evidence and the jury never got to consider Mr. Tracy's statement as substantive evidence and I was, in fact, precluded from impeaching Mr. Tracy. I was precluded from impeaching him substantively. So that's the first really important point is that we're not dealing with a piece. You want me to take some time? As good as I'm going to get. I spent the weekend like that, sir. So that was not in front of the jury substantively and that's an important point. Secondly, I need to emphasize to the court that when we began, when I began impeaching Mr. Tracy, that was entirely in good faith and that's why we made Exhibit 112 a part of the supplemental excerpt of record. The record establishes that Mr. Tracy would not speak to me prior to trial. He made it clear he wasn't crazy about testifying, which is no surprise in my business. That happens all the time and you just count on people telling the truth and we had a statement where he clearly had been told by Mr. Wong that Brooks was the supplier. He had met Mr. Brooks. So we absolutely had a good faith basis to put Mr. Tracy on the stand and rebut the allegations of recent fabrication that Mr. Wong had made it up after he got arrested to sort of get Brooks. How much of a beef was Mr. Wong working off by testifying in this case? Well, he was facing a mandatory 10, Your Honor. Mandatory 10? Yeah, he was facing a mandatory 10. He had quite a lot of incentive to cooperate. Mr. Wong? Mr. Wong had and he did have a lot of incentive to cooperate. Yes, he absolutely did. I assume all of that incentive was explored with the jury also. It was explored exhaustively and Mr. Brimes is one of the finest attorneys I've ever had the privilege to practice against and that was gone to exhaustively. But in the end, here's my argument about Mr. Tracy. It's almost there because even though when he got hostile and went south on me and started saying, I don't remember, I don't recall, that might be my signature, it might not be, I might have made this statement, I might not have, and this is what happened. I mean, we've got this allegation of a, the impeachment had to go step one, step two, step three, and I saw him going south and I did, I got ahead of myself and I went right to three. But here's why it's almost there. Because Mr. Tracy volunteered the question, the answer I had to impeach, and that's in the record. Mr. Tracy said, and it's in the supplemental exhibit of record at page 920, he said Wong never told me who supplied his ice. Chico, he kept that to himself. Chico never said anything about who supplied his ice. So while the government got ahead of itself in impeaching, got a little turned around there, our argument is harmless error because Mr. Tracy said the thing I had to impeach. He said he volunteered that Randy Wong never told him. In essence, there's simply no set of circumstances under which I would not have been able to ask the question that I eventually asked. Suppose I had asked, as I was supposed to, did Wong ever tell you who his supplier was? And then Mr. Tracy said, no, he never told me. Well, then I would have been able to ask the question that I did ask and the question that the defense is objecting to now. I would have been able to say, well, didn't you tell Special Agent Lawson that Randy Wong got his ice from Brooks? I mean, I would have been able to impeach in that way. And that's exactly what I did. Suppose, in the alternative, I had asked, as I was supposed to, did Wong ever tell you who his supplier was? And Mr. Tracy said, yes, he told me it was Stephen Brooks. He stuck to his statement. Well, then the issue would have been done, okay? And actually that would have come in substantively. And then the final, the only other answer he could have given was, suppose I had said, as I was supposed to, did Wong ever tell you who his supplier was? And Mr. Tracy said, well, I don't remember. I'm not sure. I made a statement. They were pointing a gun to my head. I'm not really sure. I don't remember. He said all those things. Then, given his squirreliness and given his incredible apparent lack of memory and given his statement that he just simply didn't recall, I would have been entitled to impeach him. Not substantively, but I would have been entitled to impeach him to show that he's being credible, to show that he's not telling the truth. And I would have been able to ask him, in fact, the question that I asked him. Well, didn't you tell Special Agent Lawson that, you know, Brooks was your supplier? Didn't you tell him that? So, in the end, it is a harmless argument for the government because, although, you know, we leaped to the impeachment prematurely, there's simply no set of circumstances under which I wouldn't have been able to ask that question. And, frankly, I was saved by Mr. Tracy volunteering the very statement that I had to impeach. You're getting down to your last five minutes. A couple of things I wanted to ask you about. Yes, sir. Maybe you can help me. I can't find out where or you had about 25 minutes left of the six hours before he started talking after he was arrested. What did he say that was incriminating at that time? Well, he confessed. Mr. Brooks confessed to the – what did he confess to? Do you have the time of this so-called confession? His confession? It was a couple of days later, wasn't it? That was after. That was a two days later one. No, what happened was he – when they brought him back to the DEA office and he said he wanted to cooperate, he wanted to talk, and he signed the Miranda form and all the rest, he talked about the instant offense. He talked about – he confessed only to count one. And then they were pressing him about, well, who's your supplier? Where did you get her from? Who are you dealing with? Who else did you deliver to in a way? And that he didn't want to give up. And so they were sort of going around and around about, well, tell us more. We know you brought dope yesterday, and we know you showed up for the payment today. We know all that. And so what did not come into trial, sir, and what was discussed in the next day and all of those debriefings afterwards were sort of like the organization, the structure, the stuff that would support count two, and that, in fact, was never admitted at trial. Are there more? Well, I was just wondering about the delay. He was kept overnight and arraigned the next day, but he signed a waiver, didn't he? He signed the Miranda waiver, which incorporated a waiver of speedy arraignment. And that was just about as the clock ran down on the six hours. Had he said anything incriminating before that? Before, yes. And what were they doing with him for the five and a half hours before he signed the Miranda agreement? They were taking care of him. They took him to Queens. When he showed up to pick up the money and he reaches for the money, then the DEA pulls up and Mr. Brooks starts to run, and he's tackled. And he is brought to, he's arrested, he's brought to the DEA office, but he's hyperventilating and he's wrecked. So what they do is they ask him, do you want to go to Queens, our hospital here? And so they take him down. He says yes. So they take him down to Queens. He spends some time there. He gets checked out. He's okay. And then they bring him back. And so there was, a lot of the delay was because they took him to the hospital. Is there anything else? I just have one, I just have one and a half minutes. So, I mean, I do wish to put the case in context, and the Court's already made reference to it. This is a very, very strong case for the government. We had a confession to count one. We had the work of an undercover agent. About 20 tape-recorded phone conversations in which Mr. Brooks clearly refers to his prior drug dealing and his desire to sell drugs. We had, we did have the accomplished testimony of Randy Wong, but more importantly, and actually what really was the hallmark of the case was the testimony of the defense witness, James Gravely, who really sunk Mr. Brooks. We had the defense's prior convictions for drug dealing, the 404B evidence. We had bank records showing enormous and inexplicable cash deposits that were completely incompatible with the tax returns for landmark telecommunications, Mr. Brooks' business. We had cellular telephone records, $17,000 in his hotel room. This is a very strong case for the government. And so if the ball was bobbled when I was impeaching Spencer Tracy, we do return to our harmless error argument, but we do maintain that the judge made absolutely no error in limiting the testimony of Silver Brooks. Thank you, Your Honors. I only have one question. Would your argument be the same if his name were Tracy Spencer? I can't tell you how hard that was for me to work around, Your Honor. Okay. Mr. Kline, rebuttal. Thank you, Your Honor. I always appreciate when we listen to prosecutors commenting how great the trial attorney was, Your Honor. That causes almost as much concern as when we read in the record the trial attorney commenting about how wonderful the defense counsel is on the record as well. I mean, they both serve a purpose, trying to strengthen the record, Your Honor. Interesting enough, before she made that comment, she was criticizing the trial counsel, Your Honor, for not completing the full circle, so to speak, on Silver Brooks. As long as we're discussing Mr. Brooks' trial counsel's exceptional work, it brings us to that other point that was raised in the brief, Your Honor, having to do with his request for an agency instruction, which wasn't relevant to anything, Your Honor. The fact is that there are a million reasons why people don't testify when it comes down to the trial. Perhaps there's something regarding a delay in an arraignment, or perhaps there's statements that they made, or perhaps they're not good speakers, or perhaps they may not look good in front of a jury. But that doesn't change the fact as far as rules of evidence, and it doesn't change the fact as far as why certain questions should not be asked and they shouldn't be permitted to answer that, and that has to do with Silver Brooks. I mean, the flip side of it was that Ms. Sheehan indicated that when she was talking to Spencer, she acknowledged that she made a mistake. She jumped the gun. She shouldn't have asked, did you say this to Lawson? Well, an objection was made at that point. It was the trial court's duty at that point to sustain an objection. I mean, there's no issue about that. I mean, you know, when we go ahead and we have these rules and we have an adversarial procedure, we all are expected to follow certain rules that go here, and Ms. Sheehan says, well, perhaps, you know, it wouldn't have made a difference because I just would have went on and I just would have done anything. Well, I've had opportunities where I've sat there and I've floundered in front of judges or I've floundered in front of juries and asked questions that I shouldn't have. And there's been objections sustained and I can't get anything in at that point. That's part of the system, you know. You know, the fact is that what we had there, that the question that was asked at that point was, did you tell Lawson this? Did you tell Lawson this? Was it relevant? Absolutely not. Talk about me not having an argument about Silva Brooks. I mean, about a threat that's being made. The fact of asking a witness, did you tell Lawson this? I mean, what's that relevant if that's overruled? And that's permitted to go on through that. You know, the prosecutor says, well, we don't have any substantive thing there. Well, the jury's hearing this, you said this, you said that, you said this to Lawson, and they're all thinking the same thing. Well, if he said it to the police officer, we know the police officer's not going to lie about anything.  And that's why we couldn't go into it with it. Well, you know what? It doesn't matter what it is. And if he's going to lie, and you know what we would argue then? We would say, if you're going to lie about something so meaningless as a stuffed bird, what are you going to do when it's an important case like this? Right? I mean, and that's the argument. It's even better when it's something silly you're going to lie about. These are important issues. We've talked about sending people to jail for the rest of their lives on these cases. You know, Mr. Brooks is now spending more than 20 years in jail on all this sort of stuff. We're not talking games here or whatever. We're always told, well, you can't go into this with the police officer because, well, Lawson could have explained it. He could have said, look, I didn't say that, or he could have said, you know, I didn't mean that, or he could have said whatever he wanted to say about the issue. But when the jury is here to make a decision about people's lives, they should hear the facts of the case. And they hear certain facts. They hear the facts that it seems the government wants to hear. And the trial court is going along with all this. They're going along and they're saying, yeah, you can't talk about the threat to Silva Brooks that was communicated. You can't talk about, you know, Spencer, and you can't talk about, you know, Hentorn material. And we all sit here now, you know, sometimes we criticize the trial attorney and sometimes we pat him on the back on all this sort of stuff, but it's Mr. Brooks who is now in jail concerning all this. When the jury needs to make these sort of decisions, they should make these decisions based upon all the evidence that they have in these sort of cases. And the evidence includes these threats that were made to the wife, and the evidence also includes the fact that Mr. Lawson was accused of lying. Even if it's something minor, even, you know, from a defense standpoint, we'll argue it over and over again, Your Honor. You know, if he's going to argue it, if he's going to lie about something as stupid as a stuffed bird, what is he going to do in order to make a case? Thank you. If there's any other questions. I don't think so. Thank you, counsel, for your argument in this case. And this matter will just stand submitted. Let's take a short break before hearing the remaining cases on the calendar. Thank you. Thank you. Thank you. Thank you.
judges: Goodwin, Rymer, T.G. Nelson